IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| KYRA CANNING,<br>   Plaintiff, | |
| v. | Civil Action No.: 3:20-cv-401 |
| WILLIAM SMITH, *et al*.,<br>   Defendants. | |
| JARROD BLACKWOOD, *et al*., individually and on behalf of a class of similarly situated individuals,<br>   Consolidated Plaintiffs, | |
| v. | [Previously Civil Action No.: 3:20-cv-444] |
| JOHN/JANE DOES, I-X,<br>   Consolidated Defendants. | |
| MARIA LOURDES MAURER,<br>   Plaintiff, | |
| v. | Civil Action No.: 3:20-cv-668 |
| CITY OF RICHMOND, et al.,<br>   Defendants. | |
| NATHAN ARRIES,<br>   Plaintiff, | |
| v. | Civil Action No.: 3:21-cv-85 |
| CITY OF RICHMOND, et al.,<br>   Defendants. | |

### ***BLACKWOOD* PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO AMEND PRIOR DISCOVERY ORDERS**

1

Comes now the *Blackwood* plaintiffs, by counsel, and in support of their motion to modify the orders of June 26, 2020, July 6, 2020, and December 10, 2020, related to discovery, states as follows.

## I.      Procedural History

The cases consolidated under 3:20-cv-401 concern the dispersal of a peaceful assembly by members of the Richmond Police Department on June 1, 2020, at Lee Circle, in Richmond, Virginia. The case filed by the *Blackwood* plaintiffs is a putative class action.

The complaint of the *Blackwood* plaintiffs was filed on June 16, 2021. **Case 3:20-cv-444 ECF Doc. 1.** It was filed against unknown individual officers of the Richmond Police Department. In addition to direct liability, the Complaint also pleads supervisory and bystander liability.

On June 17, 2020, the *Blackwood* plaintiffs filed a motion for leave to pursue discovery concerning the identity of the Doe defendants. **Case 3:20-cv-444 ECF Doc. 3**. After consolidation, the *Blackwood* plaintiffs and the City of Richmond endorsed an agreed order disposing of this motion, which was entered on June 26, 2020. **Case 3:20-cv-401 ECF Doc. 8**.

This agreed order, entered a mere twenty-five days after the subject incident, determined that discovery would not commence "until after the Commonwealth's Attorney for the City of Richmond completes her criminal investigation and the City of Richmond's Police Department has completed its investigation." It stated that "[T]he City of Richmond shall provide notice to Plaintiffs' counsel and the Court within five (5) days after the investigations of the Richmond Police Department and the Commonwealth Attorney for the City of Richmond have both been completed," and discovery would begin within five days thereafter. The discovery would be in the form of a subpoena *duces tecum* to the City of Richmond. The order further provided that

Court would revisit the matter if the investigations were not completed within 120 days of the order.

In a subsequent order (**Case 3:20-cv-401 ECF Doc. 16**), entered on July 6, 2020, the Court permitted a subpoena to obtain the names and badge numbers of the officers involved in the subject incident, or alternatively the City could provide a "complete list of names and badge numbers of the officers who were involved and/or present during the events that gave rise to the Complaint." This Order provided that the parties "shall keep the list and the identities on the list confidential and shall not disclose the identities of the officers without first obtaining leave of the Court." The City subsequently produced a list of seventy-one names. *See* **Case 3:20-cv-401 ECF Doc. 23.** Only names and badge numbers were provided. No information was provided about rank or role in the underlying events.

With a further consolidation order, on October 27, 2020, the Court ordered the parties to "generate a discovery plan . . . by November 16, 2020." **Case 3:20-cv-401 ECF Doc. 47.** This was subsequently extended by a week. **Case 3:20-cv-401 ECF Doc. 57.** The agreed discovery plan (**Case 3:20-cv-401 ECF Doc. 58**) proposed phased discovery. Phase I involved informal discovery of agreed information, and it anticipated assistance from a Discovery Special Master to be appointed by the Court. The discovery in this phase was to focus on "the conduct of, and identity of the officers involved, and the claims and damages of the individual Plaintiffs in the consolidated cases." The agreed plan listed several particular categories of information that the parties agreed would be exchanged, with the expectation that a Discovery Special Master would be appointed to work out disputes concerning other categories of responsive information. It anticipated the entry of a protective order, with the aid of a Discovery Special Master, but it

provided that the Order of July 6, 2020 (**Case 3:20-cv-401 ECF Doc. 16**) would remain in effect with respect to the confidentiality of the identity of the officers.

The agree information that would be exchanged, as relevant to this motion, included: (1) body worn camera or dash camera footage of the officers in the vicinity of Lee or Stuart Monuments between 7 p.m. and 8 p.m. on June 1, 2020, together with information to identify the source of the footage; (2) radio, telephone, and other audio recordings for the same period "together with any available information to identify the source of recording and the officers referenced in the recordings (e.g., identification numbers used in recording)"; and (3) CAD reports related to the incident. The Order provided, "If the Parties' informal discovery responses are not sufficient to identify the appropriate defendants . . . any Party may petition the Discovery Special Master for permission, upon a showing of good cause, to take a limited Rule 30(6)(6) [sic] deposition." Phase I was to be concluded within 90 days of the discovery order.

After Phase I discovery, the plan provided that "discovery shall be stayed automatically for 30 days to give the Parties an opportunity to participate in a mediation with the Settlement Special Master."

Phase II of discovery would then "include any issues from Phase I, but will also include discovery relating to class certification." The order then contemplated potential further discovery after a determination on the merits of class certification. The order contemplated the end of fact discovery by August 14, 2021.

An order was entered on December 10, 2020, approving of the joint discovery plan. **Case 3:20-cv-401 ECF Doc. 61.** Meanwhile, on November 18, 2020, the Court appointed Mark E. Rubin a special master for settlement purposes. **Case 3:20-cv-401 ECF Doc. 56.** To date, however, no discovery special master has been appointed.

Under the December 10, 2020 order, Phase I of discovery ended on March 10, 2021. The 30-day stay of discovery then expires on April 9, 2021.

Between February 26, 2021 and March 2, 2021, beginning just eleven days before the close of Phase I discovery, the City of Richmond provided the *Blackwood* plaintiffs sixty-nine body-camera video files, with the most relevant videos delivered on March 2. Thirty four of the videos depicted events at the Lee Monument. Twenty five of these Lee Monument videos depicted events occurring between 7:30 p.m. and 7:40 p.m., with the first tear gas being deployed at 7:35:30 p.m. The other six videos began after 7:40 p.m. Each of the videos were labeled with the name of the officer wearing the camera.

Notably, more than fifty officers were present at the time gas was deployed, so less than half the officers had body cameras operating. It appears that none of the officers that actually launched or threw tear gas had cameras operating, as though there was a pre-arranged plan to that effect. Most or all of the sergeants present did not have cameras operating, as though there was a pre-arranged plan to that effect.

On March 8, 2021, just two days before the automatic stay of discovery, the City provide three separate channels of radio traffic, covering the period of 5 p.m. to 11:59 p.m., for a total of twenty-one hours of audio. Though the City promised in the discovery plan to provide "available information to identify the . . . officers referenced in the recordings (e.g., identification numbers used in recording)," it provided no such information. The recordings are only the radio traffic, not information to identify the speaker or the persons referenced in the statements.

On March 10, 2021, the day Phase I discovery closed and the stay of discovery went into operation, the City provided numerous CAD reports of calls related to the demonstration. These CAD reports did not disclose any material information useful for identifying the officer

5

dispatched to the protests. Only at that point did it become evident that the Defendants had no intent to turn over sufficient information to identify must of the specific culprits.

In recent correspondences to attempt to resolve this matter, and avoid this motion, the City provided a spreadsheet of sworn officers of the Richmond Police Department and their badge numbers and rank. The information, however, does not reflect the roster as it existed in June 2020. This is evident, for instances, because several officers (including Chief Will Smith) that were employed and identified as involved on June 1, 2020 are not listed on the roster provided.

Counsel for the Plaintiff has communicated his specific needs, as requested in this motion, to the counsel for the City. Counsel for the Plaintiff then requested the City to respond in an itemized way to these particular requests, to try to narrow the dispute. The City has not responded since.

## II. **Factual History**

Counsel for the *Blackwood* plaintiffs has, and continues, to diligently review the information provided to try to determine the appropriate defendants to name in this suit. To illustrate the need for more information to identify the appropriate defendants, Counsel for the *Blackwood* plaintiffs proffers the following factual details, to highlight what remains known and unknown at this point.

*****

At about 7:18:30 p.m., on June 1, 2020, police radio traffic from near Stuart Monument, where the protestors were gathered at that moment, reported that all appeared to be orderly. At approximately 7:21:45 and 7:22:18 p.m., police radio traffic from near Stuart Monument reported that most of the demonstrators were moving away from Stuart Monument, down to Lee

Monument. At approximately 7:28:30 p.m., police radio traffic from near Lee Monument reported that the crowd had arrived, and all was orderly.

At approximately 7:29:15 p.m., radio traffic from near Stuart Monument reported that there was "someone on the statue, with a saw, trying to cut down the Jeb Stuart one." At about 7:29:22 p.m., an unidentified speaker asks, "Command, do you want to do anything about that, or what?" At 7:29:27, a response from "Command," and directed at a particular, named "Lieutenant," is "can you send a team up there?" The audio leaves doubt, however, as to the name of this lieutenant. It does not identify who this "Command" is. Both would be necessary to determining appropriate defendants to name.

At approximately 7:29:33 p.m., the police observer at Stuart Monument reported that "They" tied ropes onto Stuart Monument, and "Looks like two of them now up on top." A few seconds later, an officer asks for the cross-street by radio, and the response is "Lombardy and Monument"—referencing the Stuart Monument. At about 7:29:58 p.m., the observer at Stuart Monument reports "Got eyes on them. They are actively cutting the leg. Got two on top."

At approximately 7:30:16 p.m., an unidentified individual issues a command by radio to "Bring all groups" to "Respond." The identification of this officer who ordered all groups to respond is necessary to determining appropriate defendants to name.

At approximately 7:30:30 p.m., there is reference on a radio call to a "large group of people" who are "rigging up ropes," saying they were "getting ready to pull it down" and they were "ready to light those flags on fire." This, again, is a discussion of the events at Stuart Monument. At approximately 7:30:45 p.m., an officer placed a radio call: "Are we free to use gas?" At approximately 7:30:56 p.m., the same officer asked, "Are we clear to use chemical agents?"

7

At 7:31:00 p.m., an unidentified voice on the radio responds, "Ten-four," giving affirmation that the officers were free to use chemical agents. Several officers celebrated the order, and expressed that they understood they were authorized to use chemical agents on the assembly. The identity of this officer that gave the affirmation "Ten-four" is necessary to determining appropriate defendants to name.

At approximately 7:31:08 p.m., a police observer reported, "The cutters are down off the monument. They're throwing ropes on now." At approximately 7:31:08 p.m., the officer reports, "More ropes going up on the statue. More ropes."

By this time, many officers were responding to *both* the Stuart and Lee Monuments. The Complaint Exhibit 3 (drone footage at Lee Monument) indicates that the responding officers begin to arrive until approximately 7:32:10 p.m.. Altogether, an estimated fifty to sixty officers were deployed to Lee Monument by 7:35:30 (not including those remaining at their vehicles), where the last call (at 7:28:30 p.m.) reported an orderly crowd, rather than Stuart Monument, which was actively being threatened.  The officers that did arrive observed an orderly demonstration. No material or debris was thrown or launched at the officers responding to Lee Monument, prior to the tear gas being deployed at 7:35:30. No individuals approached the officers responding to Lee Monument in a hostile manner. No ropes or attempt to destroy Lee Monument was observed. No order was given to disperse. No warning was given that chemical agents would be deployed. There was no evidence of a need to deploy chemical agents, much less an emergency demanding their immediate use without a warning.

The fact that fifty to sixty officers responded to Lee Monument, when the communications all point to a threat at Stuart Monument—event giving the particular cross street by radio—point to an underlying planned response. But no information has been provided to

evaluate *what* the plan was, *who* made the plan or issued the preliminary orders, *when* the plan was made, and *why* the plan was implemented to include Lee Monument.

At about 7:31:22 p.m., a sergeant, whose identity is *believed* to be known, in a vehicle bound for Lee Monument, specifically ordered the gas assault at Lee Monument. He placed a radio command: "Gas masks on." He then directed a particular officer, using a nickname, to "put it on them when you get there, brother." The fact that he was bound for Lee Monument, not Stuart Monument, is demonstrated through the body camera footage of his driver, which shows that this sergeant directed the driver, at about 7:32:21 p.m. to go to Lee Monument and not Stuart Monument: "Straight ahead. It's the biggest one here."

At about 7:31:36 p.m., the observer at Stuart Monument reported having eyes "on the guy with the main rope."

At about 7:31:48 p.m., a command, believed to be from the sergeant that ordered the attack at Lee Monument, went out by radio, "All units, hold the air. The strike team is coming. We're going to need the air."

At about 7:32:26 p.m., an unidentified individual by radio reported, "Everyone is scattering now." This may have been a call from either Lee or Stuart Monument, because the police began to arrive at Lee Monument at about 7:32:10 p.m., and part of the crowd promptly dispersed.

Despite this call about everyone scattering, the sergeant that ordered the assault on Lee Monument makes a radio call at about 7:32:31 p.m.: "Calvary is coming, LT." "LT" is believed to be a reference to the commanding lieutenant, but his identity is unknown.

At 7:32:39 p.m., there is a radio call from an unidentified individual, "Get gas, boys. Get gas." At approximately 7:32:46 p.m., the sergeant that ordered the attach at Lee Monument

9

issued further orders. He stated that he wanted "a complete perimeter around this monument. I want total 360 coverage of this entire monument." The *only* monument he appears to be references is the Lee Monument. There is no indication that this officer, or any officer, had any information justifying dispersing the crowd at Lee Monument, four blocks removed from the events at Stuart Monument.

At about 7:32:52 p.m., a radio call, believed to be from an unidentified officer at Lee Monument, reported that the crowd was dispersing and "going north." There was indeed a large number of demonstrators from Lee Monument leaving the protest and moving north, apparently due to the police presence, and the presence of a sniper in plain view, pointing a rifle at the crowd.

At about 7:33:05 p.m., the sergeant that order the attack at Lee Monument arrived on the scene. At 7:33:08 p.m., he orders the "strike team" (which appears to mean the officers present and those arriving) to engage "the crowd." He is the first officer to cross Lee Circle and take up a position in front of the sidewalk on the inside of Lee Circle, though other officers follow him. At 7:33:22 p.m., he orders the "strike team" to "form a line." At 7:33:32 p.m., this sergeant orders "as soon as you are free, hit them with gas." The transmission was partially cut off, but video shows it was intended to be directed at a particular officer or two, including the officer he previously directed to "put it on them." At about 7:34:20 p.m., this sergeant orders, "Give me a 360," and directs another named sergeant to "get your team to watch both sides and the back." The officers immediately respond by forming a box formation.

At about 7:34:52 p.m., there is a radio call from an unidentified voice, indicating "Team, we'll be there momentarily." There is no information who this is coming from. At approximately 7:34:59 p.m., another call from another unidentified voice states, "Do you still have people

10

coming?" This is follows with a call "Five-oh-one, if you only have one strike team coming, you may want to send two, please." Meanwhile, an armored vehicle with a SWAT team arrives and slowly begins to deploy.

The members of the SWAT team are largely unknown. This is significant, because those individuals may have no liability.

Before the SWAT team moves out and away from the vehicle, another call comes from an unidentified voice, at approximately 7:35:17 p.m., "We're all here…" The video shows that two police vehicles approach the police line around Lee Monument, and as the approach, the sergeant that ordered the attack turns and nods and signals. Two officers, one of them being the officer told to "put it on them," respond to this by pulling the pins on cannisters of tear gas. The officer told to "put it on them" threw the first tear gas at approximately 7:35:30, and it explodes at approximately 7:35:31 in front of the crowd.

No information has been provided about who was in these two vehicles that approached. It appears the sergeant waited for the vehicles to arrive. This could be significant in evaluating the appropriate defendants.

This officer that threw the first cannister manages to launch a rocket propelled cannister a few seconds later. At the same time, another officer, from one of the arriving trucks, throws a cannister. Another cannister is thrown by the officer adjacent to the first officer, because he had fumbled in pulling the pin, delaying him. This cannister is likely responsible for the injuries of Plaintiff Keenan Angel. Other officers fire, many of whom can be seen on the footage but are not currently identifiable. Some identified and unidentified officers begin to use their "foggers," or spray cans of chemical agents.

As noted above, it appears that *none* of the officers that threw or launched tear gas had body cameras operating. As a result, their identities are unknown, or have only been deduced by careful and time-consuming research and analysis. Additionally, knowing the individuals that used the foggers is necessary to determine the appropriate defendants.

At about 7:36:01 p.m., the sergeant that ordered the attack used hand signals to lead several of the officers along the southern side of the circle, into the remaining demonstrators, using automatic rifles to threaten, and foggers to spray the crowd. This sergeant then personally sprays Ryan Tagg, without provocation or justification, at approximately 7:36:24 p.m.

Meanwhile, at about 7:36:02, the officer that threw the first cannister and launched the second canister proceeded to launch a cannister across the smoke-filled circle toward the people on the north side of the circle. This cannister landed closed to Chris Gaylor, as depicted in Exhibit 8 of the Complaint, and caused his injuries.

The last protester is then seen leaving the circle at about 7:37:07 p.m., as officers seize control of Lee Circle. Unidentified officers continued to launch cannisters toward protesters that moved out of the circle and down the street. Protesters gather on some of the side streets, as the police form lines in front of them.

The police did not deploy chemical agents at Stuart Monument until approximately 23:39:10, several minutes after the attack at Lee Monument.

The assembly gradually dispersed as 8 p.m. approaches, and the police depart a few minutes before 8 p.m.

### III. Law

Federal Rule of Civil Procedure 26 gives the Court broad discretion over the circumstances and timing of discovery. Rule 26(c) also gives the Court control over protective

orders. Generally, these orders should be used to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

To name particular defendants in this case, the plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It may only plead facts that "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. Pro. 12(b)(3).

### IV. Argument

#### a. The *Blackwood* plaintiffs need additional discovery as to the identity of the appropriate, individual defendants.

To date, the City has failed or refused to provide sufficient informal Phase I discovery for the Blackwood plaintiffs to name the appropriate, individual defendants, without being overinclusive or underinclusive.

The *Blackwood* plaintiffs have identified some key individuals that would be appropriate defendants. That is, the *Blackwood* plaintiffs have identified several individuals against whom they can state claims for relief that are plausible on are face with evidentiary support.

It is evident to the *Blackwood* plaintiffs, however, that naming *only* those individuals would be underinclusive, as they know through the evidence that other unidentified individuals are, or are likely, also liable. These unidentified individuals include both individuals that can be seen but not identified on the videos, and individuals that can be heard but not identified on the audio. Additionally, the evidence is not sufficient to determine, one way or another, whether certain officers named as "involved" pursuant to the order of July 6, 2020 are liable.

It is also clear that some individuals that can be seen but not identified on the videos are likely *not* liable. As such, though the City has provided a list of seventy-one officers that were

"involved" pursuant to the order of July 6, 2020, it would be overinclusive to name all seventy-one officers.

The *Blackwood* plaintiffs would attribute the present circumstances to two factors. First, the Court did not find or appoint a discovery special master. The discovery plan was formulated with the understanding that a discovery special master would be appointed to assist in resolving disputes concerning the scope of the Phase I discovery. As such, the categories of information that the parties agreed to exchange represented only the information that no party objected to exchanging under the terms agreed to. It did not represent all of the information the plaintiffs expected they needed for identification of the defendants. No discovery master has been appointed, presumably because the Court has had difficulty in finding someone willing to serve in that capacity.

Second, the City has failed or refused to provide sufficient information, or to provide information in time to raise the issue prior to the close of Phase I. The plaintiffs expected that the information the City agreed to provide in Phase I would be sufficient. The plaintiffs reasonably assumed that nearly every one of the fifty to sixty officers physically present at the time of the attack would have had a body camera operating. But less than half of those officers actually did. The plaintiffs reasonably assumed that the CAD report of this incident would track the badge numbers associated with the radio communications, but no CAD report concerning specifically this attack was provided. The plaintiffs expected the City to provide audio recordings "together with any available information to identify the source of recording and the officers referenced in the recordings (e.g., identification numbers used in recording)." The City promised to do so. But the City has failed to identify any officers referenced in the recordings, and failed to identify the officers whose voice was recorded. Finally, the information the City provided came on the eve of

the discovery stay, preventing the plaintiffs from being able to seek the Rule 30(b)(6) deposition contemplated in the discovery plan.

For these reasons, the *Blackwood* plaintiffs need additional discovery. They therefore ask leave to issue the subpoena contemplated in the June 17, 2020 motion. **Case 3:20-cv-444 ECF Doc. 3**. They further request leave to take a Rule 30(b)(6) deposition of City personnel, as contemplated in the Discovery Plan.

Granting this relief is not prejudicial to the City or to the individual defendants. It would allow the Plaintiffs to determine whether the facts that support claims against particular officers (or against the City itself), rather than bringing defendants into the case haphazardly. Bringing the defendants in haphazardly would unnecessarily increasing costs and unnecessarily hassle innocent officers. The chief concern in June 2020 with the subpoena was, or seemed to be, the ongoing or contemplated criminal and disciplinary investigations. Now we are 10 months removed from June 1, 2020. The police and the commonwealth attorneys have had 10 months to review the evidence, yet no charges have been brought and no discipline has been publicly acknowledged. There is no evidence that a meaningful criminal or disciplinary investigation is actively underway at this late date. Granting this relief also serves judicial economy, as it reduces the need for further motions to add or remove defendants.

### b. The *Blackwood* plaintiffs need the confidentiality order to be lifted.

Under the July 6, 2020 order, which was incorporated into the discovery plan and extended by the December 10, 2020 order, the plaintiffs are obliged to "keep the list [of involved officers] and the identities on the list confidential and shall not disclose the identities of the officers without first obtaining leave of the Court."

The *Blackwood* plaintiffs ask that this restraint be lifted. Lifting this restraint is necessary to allow the *Blackwood* plaintiffs to file an amended complaint naming defendants. They have information at this time sufficient to name some of the appropriate defendants. Lifting this restriction would also be necessary to allow the counsel to use the information to file any additional claims for other parties that were present. Lifting this restraint is therefore necessary for this case to proceed and consistent with judicial economy, as it prevents other potential claimants from having to reinvent the wheel or to go through similar discovery motions and processes in order to bring suit.

Wherefore, the Consolidated Plaintiffs respectfully request the Court to modify the orders of June 26, 2020, July 6, 2020, and December 10, 2020, related to discovery, and such further and additional relief as may be appropriate.

Counsel certifies that he attempted to confer with opposing counsel to resolve this matter, but the attempt was unsuccessful.

**Respectfully submitted,**

**Plaintiffs Jarrod Blackwood, Megan Blackwood, Ryan Tagg, Christopher Gayler, and Keenan Angel, by counsel, each individually and on behalf of a class of similarly situated persons**

By: /s/ Andrew T. Bodoh
        Counsel

Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 783-2000 (telephone)
(804) 783-2105 (facsimile)

*Counsel for Consolidated Plaintiffs Jarrod Blackwood, Megan Blackwood, Ryan Tagg, Christopher Gayler, and Keenan Angel, by counsel, each individually and on behalf of a class of similarly situated persons*

## CERTIFICATE OF SERVICE

I hereby certify that on the April 12, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send an electronic notification to all counsel of record who have appeared in this matter, including the following:

Steven D. Brown (VSB No. 42511)
IslerDare, PC
411 East Franklin Street, Suite 203
Richmond, Virginia 23219
Phone: (804) 489-5500
Facsimile: (804) 234-8234
sbrown@islerdare.com
*Counsel for William Smith*

Seth R. Carroll, Esquire
Connor Bleakley, Esquire
Commonwealth Law Group
3311 West Broad Street
Richmond, Virginia 23230
Telephone: (804) 999-9999
Facsimile: (866) 238-6415
Email: scarroll@hurtinva.com
*Counsel for Plaintiff Kyra Canning*

Jonathan E. Halperin, Esquire
Halperin Law Center
52525 Hickory Park Drive, Suite B
Glen Allen, Virginia 23059
Telephone: (804) 57-0100
Facsimile: (804) 597-0209
Email: jonathan@hlc.law
*Counsel for Plaintiff Kyra Canning*

Tim Schulte (VSB #41881)
Blackwell N. Shelley, Jr. (VSB #28142)
Shelley Cupp Schulte, P.C.
3 W. Cary Street
Richmond VA 23220
(804) 644-9700

(804) 278-9634 [fax]
schulte@scs-work.com
shelley@scs-work.com
*Counsel for Plaintiff Nathan Arries*

Theodore Webb Briscoe , III
Geoffrey McDonald & Associates PC
8720 Stony Point Parkway
Suite 250
Richmond, VA 23235
804-888-8888
Fax: 804-359-5426
tbriscoe@mcdonaldinjurylaw.com
*Counsel for Plaintiff Maria Lourdes Maurer*

Mark D. Dix, Esq.
Seth R. Carroll, Esq.
Conner Bleakley, Esq.
Commonwealth Law Group, PLLC
3311 West Broad Street
Richmond, Virginia 23230
Telephone: (804) 999-9999
Facsimile: (866) 238-6415
mdix@hurtinva.com
scarroll@hurtinva.com
cbleakley@hurtinva.com

Jonathan E. Halperin – VSB No. 32698
Andrew Lucchetti – VSB No. 86631
Isaac A. McBeth – VSB No. 82400
Halperin Law Center, LLC
5225 Hickory Park Drive, Suite B
Glen Allen, VA 23059
Phone: (804) 527-0100
Facsimile: (804) 597-0209
jonathan@hlc.law
andrew@hlc.law
isaac@hlc.law

*Counsel for Plaintiff Kyra Canning*

Lindsey Ann Strachan
Steven David Brown
Isler Dare PC
411 East Franklin Street
Suite 203
Richmond, VA 23219
(804) 489-5503

Fax: (804) 234-8234
lstrachan@islerdare.com
sbrown@islerdare.com

*Counsel for Defendant Smith*

Richard Earl Hill , Jr.
Office of the City Attorney (Richmond)
900 E Broad St
Room 400 City Hall
Richmond, VA 23219
(804) 646-7946
Fax: (804) 646-7939
Richard.E.Hill@richmondgov.com
*Counsel for Defendant City of Richmond*

Erin R. McNeill, Esq.
Blaire H. O'Brien, Esq.
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 747-5200
Facsimile: (804) 747-6085
emcneill@oag.state.va.us
bo'brien@oag.state.va.us

*Counsel for Gary Settle*

By: /s/ Andrew T. Bodoh
Counsel

Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 783-2000 (telephone)
(804) 783-2105 (facsimile)
*Counsel for Consolidated Plaintiffs Jarrod Blackwood, Megan Blackwood, Ryan Tagg, Christopher Gayler, and Keenan Angel, by counsel, each individually and on behalf of a class of similarly situated persons*